UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOSEPH DUBOIS,                          :
      Plaintiff,                        :
                                        :
    v.                                  :     CA 03-209M
                                        :
JO ANNE B. BARNHART,                    :
COMMISSIONER,                           :
SOCIAL SECURITY ADMINISTRATION,         :
      Defendant.                        :

**MEMORANDUM AND ORDER**

This matter is before the court on a request for judicial review of the decision of the Commissioner of Social Security ("the Commissioner"), denying Supplemental Security Income ("SSI") benefits, under §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) ("the Act"). Plaintiff Joseph Dubois ("Plaintiff") has filed a motion for summary judgment. Defendant Jo Anne B. Barnhart ("Defendant") has filed a motion for an order affirming the decision of the Commissioner.

With the parties' consent, this case has been referred to a magistrate judge for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. For the reasons set forth herein, I find that the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and is legally correct. Accordingly, based on the following analysis, I order that Plaintiff's Motion for Summary Judgment ("Motion for Summary Judgment") be denied and that Defendant's Motion for an Order Affirming the Decision of the Commissioner's ("Motion to Affirm") be granted.

## Procedural History

Plaintiff filed the instant application[1] for SSI on August 25, 2000,[2] alleging disability since January 15, 2000[3] (Record ("R.") at 21), due to peripheral neuropathy, hepatitis C, a seizure disorder, and an anxiety disorder (R. at 304). The application was denied initially (R. at 242-44) and on reconsideration (R. at 247-50). Plaintiff timely requested review by an administrative law judge ("ALJ"). (R. at 251) A hearing was conducted on June 26, 2002, at which Plaintiff, represented by counsel, appeared and testified. (R. at 29-57) A vocational expert was present at the hearing and testified as well. (R. at 50-56)

On August 22, 2002, the ALJ issued a decision in which he found that Plaintiff was not disabled and, therefore, not entitled to SSI. (R. at 18-28) Plaintiff appealed the ALJ's decision to the Appeals Council (R. at 17), which on May 6, 2003, denied Plaintiff's request for review (R. at 13-15), thereby rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff filed a complaint in this court on May 30, 2003. Defendant on August 18, 2003, filed a motion to remand to the Commissioner for further action, because the Commissioner had not

---

[1] Plaintiff filed a previous application for Supplemental Security Income ("SSI") on October 15, 1998. (R. at 271) The application was denied at the initial level (R. at 236-39) and Plaintiff requested review. An administrative law judge ("ALJ") dismissed Plaintiff's case due to Plaintiff's nonappearance at the scheduled hearing after the Notice of Hearing was sent to him and good cause for failure to appear was not found. (R. at 225, 229-32)

[2] This date represents a protective filing date. (R. at 299).

[3] In his Fact Sheet for Social Security Appeals and Plaintiff's Brief, Plaintiff identifies his alleged disability onset date as January 15, 2000, see Fact Sheet for Social Security Appeals at 1; Plaintiff's Brief at 1, while Plaintiff's Disability Report indicates that the onset date is November 7, 1992 (R. at 304).

received a transcript.   The motion to remand was granted on
August 29, 2003.

Defendant filed a motion to reopen the action on November
25, 2003, after a copy of the administrative record had been
prepared.   Defendant on December 1, 2003, filed her answer, and
the case was subsequently assigned to this Magistrate Judge.   On
April 23, 2004, Plaintiff filed the instant Motion for Summary
Judgment.   The Motion to Affirm was filed on June 22, 2004.

## Issue

The issue for determination is whether the decision of the
Commissioner that Plaintiff is not disabled within the meaning of
the Act, as amended, is supported by substantial evidence in the
record and is legally correct.

## Background

Plaintiff was born on November 7, 1963.   (R. at 276)   He has
a ninth grade education and past relevant work experience as a
plasterer, church sexton, telemarketer, and inserter.   (R. at 22,
26, 34, 291)

## Medical Evidence

The record contains the following exhibits: an
Electroencephalogram ("EEG") report from Matthew J. Murnane,
M.D., conducted at Roger Williams Hospital (October 9, 1997) (R.
at 319); a report of a University Medical Group Electromyography
and Nerve Conduction Study performed by Dr. Murnane (December 29,
1997) (R. at 320); Integrated Progress Notes from University
Medical Group (April 8, 1998-April 29, 1998) (R. at 321);
evaluation notes from Nancy Harritos, FNP, of the Medical Primary
Clinic of Rhode Island Hospital (June 9, 1998) (R. at 322-23,
331); clinical test results from Rhode Island Hospital (June 10,
1998) (R. at 324-31); records regarding Plaintiff's inpatient
detoxification at Roger Williams Medical Center (September 10,
1998-September 14, 1998) (R. at 332-39); a Physical Residual

3

Functional Capacity Evaluation and Disability Determination
Services ("DDS") Case Review Form by Youssef Georgy, M.D.
(November 6, 1998) (R. at 340-48); a letter from Substance Abuse
Counselor Karen Maine of SSTAR of Rhode Island, Inc., indicating
that Plaintiff spent from December 12, 1998, to December 18,
1998, at the North Kingstown detoxification facility but had not
accepted any aftercare and thus his program was considered
incomplete (R. at 349); a Rhode Island Department of Human
Services Physician Examination Report by John M. Bleyer, M.D.
(January 6, 1999) (R. at 350-53); a DDS consultative examination
report by Frederick Evans, M.D. (October 16, 2000) (R. at 354-
56); a psychiatric review report, a Mental Residual Functional
Capacity Assessment, and a DDS Case Review Form by Mary Ann
Paxson, Ph.D. (October 30, 2000) (R. at 357-75); a Medical
Consultant's Review of Physical Residual Functional Capacity
Assessment (February 21, 2001) (R. at 376-77); a Medical
Consultant's Review of Psychiatric Review Technique Form and a
Medical Consultant's Review of Mental Residual Functional
Capacity Assessment (February 7, 2001) (R. at 378-81); a
disability examination report by Steven G. McCloy, M.D. (November
29, 2000) (R. at 382-84); Laboratory Corp. test results (November
30, 2000) (R. at 385); a Physical Residual Functional Capacity
Assessment and a DDS Case Review Form by Edward R. Hanna, M.D.
(January 29, 2001) (R. at 386-94); a Review of Psychiatric Review
Technique Form, a Mental Residual Functional Capacity Assessment,
and a Rhode Island DDS Case Review Form by Ann. M. Frank, Psy.D.
(June 15, 2001) (R. at 395-412, 422); a Physical Residual
Functional Capacity Assessment and a Rhode Island DDS Case Review
Form by Thomas A. Bennett, M.D. (May 4, 2001) (R. at 413-21);
records from Memorial Hospital's Family Care Center completed by
various doctors and medical students (January 17, 2001-March 14,
2001) (R. at 423-32); Gateway Emergency Service Screening Forms

4

(February 4, 2001, February 8, 2001) (R. at 433-34); progress
notes from Community Counseling Center (February 20, 2001-March
14, 2001) (R. at 435-38); an examination report and questionnaire
completed by Christopher Lege, M.D. (June 8, 2001) (R. at 439-
42); ATMED Primary Care Routine Follow-Up and Routine Visit Forms
filled out by Dr. Lege (July 6, 2001-February 4, 2002) (R. at
443-48); a Medical Questionnaire and a Physical Capacity
Evaluation completed by Dr. Lege (April 4, 2002) (R. at 449-51);
and a letter stating Dr. Lege's opinion that Plaintiff is not
able to sustain full-time employment due to his impairments
(April 9, 2002) (R. at 452).

### Administrative Hearing

Plaintiff, represented by counsel, appeared at the June 26,
2002, hearing.  (R. at 29, 31)  The ALJ conducted a brief
introduction, explained the hearing procedures, and identified
the exhibits.  (R. at 31-34)

Plaintiff's counsel then made an opening statement which
began with Plaintiff's age, education level, and past
occupations.  (R. at 34)  She described Plaintiff's medication-
controlled seizure disorder and the side effects which he
experienced from taking Phenobarbital, including reduced
coordination, leg weakness, difficulty with fine motor hand
dexterity, and reduced ability to focus and remember.  (Id.)
Counsel stated that Dr. Lege was treating Plaintiff for an
anxiety disorder and panic attacks and that Plaintiff took Paxil
and other medication.  (Id.)  She pointed out that Plaintiff's
anxiety and frequent panic attacks affected his ability to
remember and focus and caused him to be uncomfortable around
people.  (R. at 34-35)  Counsel also noted Plaintiff's history of
hepatitis C which caused fatigue.  (R. at 35)  She argued that
Plaintiff did not have the ability to perform any physical
activities given his medical and psychological impairments.

(Id.)  Plaintiff's attorney noted his long history of substance abuse, primarily alcohol abuse, requiring multiple detoxifications. (Id.)  However, she stated that Plaintiff had been sober for a significant period of time, that he had been prescribed Antabuse, and that his medical conditions persisted despite his sobriety.  (Id.)  Counsel contended that Plaintiff's seizure disorder preceded his alcoholism and that the seizures were not the current problem but rather the side effects of the seizure medication.  (Id.)  She concluded by asserting that Plaintiff's alcoholism was not a significant factor material to a finding of disability.  (R. at 36)

Plaintiff then testified.  He stated that he was thirty-eight years old, single, and had no children.  (R. at 36) Plaintiff lived with a female friend.  (Id.)  He completed the eighth grade and started the ninth grade.  (Id.)  Plaintiff attempted some basic courses at the University of Rhode Island in 1996 or 1997, but dropped out because he could not keep up with the work.  (R. at 37)

As far as attempting to work, Plaintiff related that he tried to work for some employers in the Pawtucket area but was unsuccessful because most of the jobs involved heavy lifting, extensive walking, or stair or ladder climbing.  (Id.)  Plaintiff identified his most recent employment as being a laborer at a maintenance company for a few months.  (Id.)  He stated that he lost this job because he was too slow at getting his work done. (Id.)  Additionally, Plaintiff testified that he had worked for a temporary agency called Preferred Labor where he performed different jobs, including that of a paper inserter.  (R. at 37-38)  However, after being switched to a job which required that he climb onto a truck to unload it, Plaintiff was fired because he was unable to do this.  (R. at 38)  Plaintiff also related that his employer incorrectly thought he was intoxicated due to

6

his gait.  (R. at 38)  In general, Plaintiff testified that he
was unable to work because he is used to working as a laborer and
he cannot do that kind of work due to his leg, knee, and
equilibrium impairments.  (R. at 38-39)

Regarding his difficulty with balance, Plaintiff stated that
his doctors attributed it to a neurological disorder, resulting
from damage to the back of his head.  (R. at 39)  Although
Plaintiff testified that the doctors had no explanation for the
damage, he offered that it could have been caused by his
alcoholism or his many head injuries.  (Id.)  Because of his
problem with balance, Plaintiff stated that he cannot walk
backwards, walk toe-to-toe, kick an object, or stand on one leg
without holding on to something for support.  (Id.)  He stated
that he has fallen quite often, especially when carrying
something but also when he has been sitting for more than a half
an hour.  (R. at 49)

Plaintiff also testified as to his seizure disorder.  (R. at
40)  Plaintiff stated that Phenobarbital was controlling his
seizures.  (R. at 39-40)  He related that he has not had a
seizure in quite a while (R. at 40), although he gets "fugues"
(id.) when he forgets to take his medication (id.).  Plaintiff
further recounted that he has had controllable petit seizures
over the years.  (Id.)  Additionally, he had grand mal seizures
until three years ago.  (Id.)

Regarding Plaintiff's other impairments, he testified that
he has trouble concentrating while reading because his mind
drifts and has to keep re-reading the page (R. at 45) but that he
is able to follow a television program (R. at 50).  He indicated
that he sometimes fails to finish projects.  (R. at 45)
Plaintiff said he has a difficult time remembering dates and
appointments.  (R. at 50)  He also mentioned that he avoids
crowds due to his panic attacks (R. at 45) and described them to

7

the ALJ (R. at 47), although he observed that he has not had an attack in quite some time (R. at 46)  Plaintiff related that he gets these attacks when he is in public places, in crowds, or while crossing the street.  (R. at 47-48)

The ALJ questioned Plaintiff about the effectiveness of the medications he takes and any side effects he experiences.  (R. at 41)  Plaintiff responded that the combination of Phenobarbital and Valium sometimes makes him "a little drowsy ...." (<u>Id.</u>)  He did not know if the medication had a direct effect on the neuropathy in his legs but he felt more comfortable on the medication.  (<u>Id.</u>)

Plaintiff was asked by the ALJ to recite his history with substance abuse.  (<u>Id.</u>)  Plaintiff stated that his problems with alcohol began when he was seventeen or eighteen.  (<u>Id.</u>)  He has completed treatment programs and has had periods of sobriety lasting over one year, but also has had "slips" during which he drank heavily.  (<u>Id.</u>)  After Dr. Bleyer prescribed Antabuse for Plaintiff, he had only one or two brief "slips." (R. at 41)  Plaintiff related that he attends AA meetings six to seven times a week and has a sponsor.  (R. at 42)

Plaintiff testified about his daily activities.  (Id.)  He recounted that he showers regularly and helps with some domestic chores such as cleaning the toilet, scrubbing the floor, doing grocery shopping, and cooking.  (R. at 42-43)  Plaintiff said that while he cooks he sits at the kitchen table because his legs will start shaking if he stands the entire time.  (R. at 48)  He indicated that he goes to bed early, sleeps well, and usually wakes up between 5:00 and 6:00 a.m.  (R. at 43)  During the day he normally stays in the house and watches television or talks on the telephone.  (<u>Id.</u>)  Plaintiff visits his mother in a nursing home every couple of weeks, although he does not keep in contact with his sister on a regular basis.  (<u>Id.</u>)

8

Plaintiff estimated that he could not walk or stand more than twenty minutes to a half an hour without needing to rest and that he could sit for a couple of hours at a time but could not bend very well.  (R. at 44)  He indicated that he could carry about twenty pounds short distances.  (<u>Id.</u>)  Plaintiff said that his hands and fingers gave him a little trouble (<u>id.</u>), but also described himself as being "pretty dexterous" (<u>id.</u>) when he was in a seated position (<u>id.</u>).  He agreed that he lacked coordination in his hands, although he added that he noticed it much less than before.  (<u>Id.</u>)  However, he noted that he still could not help his girlfriend put on her jewelry.  (R. at 44-45)  Plaintiff's attorney also inquired regarding Plaintiff's hand impairments.  (R. at 46)  Plaintiff related that he has some difficulty writing and signing his name and that he has dropped soap in the shower and spilled cups of coffee.  (<u>Id.</u>)  He attributed these hand problems to getting nervous and concentrating so hard that his hands shake.  (<u>Id.</u>)

Vocational expert ("VE") Ronald Briere testified.  (R. at 50-56)  He identified and characterized Plaintiff's past work as follows: a plasterer in the construction industry as semi-skilled work at the heavy exertional level; a church sexton as unskilled work at the light exertional level; a telemarketer as unskilled work at the sedentary level; and a flyer inserter in the newspaper industry as unskilled work at the sedentary level.  (R. at 51)  The ALJ propounded the following hypothetical to the VE:

> [A]ssuming an individual of [Plaintiff's] age, education, and work experience, and that he could perform work at an exertional level that did not require lifting more than ten pounds frequently -- or ten pounds occasionally, no more than ten pounds. Standing and walking no more than two hours per eight-hour day, sitting more than six hours per eight-hour day, with a sit-stand option.  This individual could occasionally kneel and crawl.  No bending or squatting. He would not be able to use his legs for pushing and

> pulling of foot controls.  He could not work around
> unprotected heights, moving machinery, noise and
> vibration, extreme temperatures.  No dust or fumes.  He
> would have a moderate reduction in the ability to
> concentrate, relate appropriately to supervision.
> Could that individual do any of [Plaintiff's] past
> relevant work?

(R. at 51-52)  The VE responded that Plaintiff's past relevant
work as a telemarketer would be within the hypothetical.  (R. at
52)  The ALJ added the inability to perform fine manipulation
activities to the hypothetical, and the VE stated that work as a
telemarketer was still within the capability of the individual
described.  (Id.)  The ALJ then added a moderately severe
reduction in the ability to concentrate and to relate
appropriately to supervision.  (Id.)  The VE replied that
Plaintiff's past relevant work would be eliminated.  (Id.)

     Plaintiff's counsel cross-examined the VE.  (R. at 52-56)
She asked the VE to describe a telemarketer's duties.  (R. at 52)
The VE testified that a telemarketer sits at a station and tries
to sell a product over the telephone to individuals who have been
coded on a computerized telephone directory.  (R. at 52-53)  The
VE added that a telemarketer must document whether or not a
person is interested and that this is usually done by pressing
buttons and occasionally by making checkmarks.  (R. at 53)  The
VE stated that if a person were unable to write any words or
perform any documentation, employment in the position would be
precluded.  (Id.)  Plaintiff's attorney asked the VE if
telemarketers held telephones.  (Id.) The VE answered
ambiguously: "Not usually, no.  It's -- yeah, yeah."  (Id.)
Plaintiff's counsel added to the ALJ's first hypothetical the
inability to maintain a regular work pace and asked if that would
affect Plaintiff's ability to perform his past relevant work as a
telemarketer.  (R. at 53-54)  After clarifying that the
limitation posited by the attorney was more than moderate, the VE

testified that this addition would preclude employment as a
telemarketer.  (R. at 54)

Resuming his questioning, the ALJ added the inability to
consistently hold a pen and to perform the fine manipulation
contained in his second hypothetical and then asked the VE if
there were work, other than being a telemarketer, which a person
with the hypothetical claimant's residual functional capacity
("RFC") could perform.  (Id.)  The VE responded that such an
individual could perform other sedentary, unskilled, entry-level
occupations, including an inspector of eyeglass frames in the
optical industry, an inspector of photo apparatus in the photo
industry, a dial inspector in the clock and watch industry, a
packer, and an inspector of circuit boards in the electronics
industry.  (Id.)  The VE further related that there are
approximately 8,000 of these jobs existing in the regional
economy.  (Id.)

Plaintiff's attorney recross-examined the VE.  (R. at 55-56)
She asked the VE about the size of the objects involved in the
inspection jobs.  (R. at 55)  The VE answered that the objects
were small in the sense that they had to weigh less than ten
pounds to be within the sedentary regulations but that they were
not considered fine manipulatory objects, although some of them
could be smaller than a coffee mug.  (R. at 55)  He went on to
say that the person must be able to handle the object and look at
it with at least one hand.  (R. at 55)  (R. at 55-56)  The VE
testified that the individual would have to be able to grasp
objects the size and texture of a pen or a pair of glasses
consistently throughout a six to eight hour day.  (R. at 56)

Plaintiff's attorney made a brief closing statement, arguing
that one of Plaintiff's primary impairments is the lack of
coordination in his legs and hands as a result of his medication.
(Id.)  She further contended that all of the jobs identified by

11

the VE involve handling objects at a regular pace and that the
record did not reflect that Plaintiff would be able to maintain
such a pace over time.  (R. at 56-57)

### Standard of Review

The court's function in reviewing the Commissioner's
decision is a narrow one.  See Geoffroy v. Sec'y of Health &
Human Servs., 663 F.2d 315, 319 (1st Cir. 1981).  The court does
not reconsider facts or re-weigh the evidence.  See Schoenfeld v.
Apfel, 237 F.3d 788, 792 (7th Cir. 2001); see also Rodriguez v.
Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)
("[T]he resolution of conflicts in the evidence and the
determination of the ultimate question of disability is for [the
Commissioner], not for the doctors or for the courts."); Lopez v.
Chater, 8 F.Supp.2d 152, 154 (D.P.R. 1998)("In reviewing the
record, the district court must avoid reinterpreting the evidence
or otherwise substituting its own judgment for that of the
Secretary.").  The decision "will be overturned only if it is not
supported by substantial evidence,[4] or if it is based on legal
error."  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995);
see also Evangelista v. Sec'y of Health & Human Servs., 826 F.2d
136, 144 (1st Cir. 1987).  If supported by substantial evidence
in the record, the Commissioner's decision must be upheld even if
the record could arguably support a different conclusion.  See 42
U.S.C. § 405(g)(2002); Rodriguez Pagan v. Sec'y of Health & Human
Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Lizotte v. Sec'y
of Health & Human Servs., 654 F.2d 127, 131 (1st Cir. 1981)

---

[4] The Supreme Court has defined substantial evidence as "more
than a mere scintilla.  It means such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."
Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28
L.Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S.
197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); see also Lopez v.
Chater, 8 F.Supp.2d 152, 154 (D.P.R. 1998); Suranie v. Sullivan, 787
F.Supp. 287, 289 (D.R.I. 1992).

("Although we as the trier of fact might have reached an opposite conclusion, we cannot say that a reasonable mind could not have decided as did the [Commissioner] ....").

## Errors Claimed

Plaintiff claims that the ALJ erred in: (1) characterizing Plaintiff's past work as a telemarketer as past relevant work; (2) failing to mention, credit, or discredit Dr. Bleyer's opinion as to Plaintiff's functional limitations; and (3) allegedly rejecting the opinion of the state agency psychological consultants as to Plaintiff's psychological limitations and substituting his opinion for that of the medical experts. See Plaintiff's Brief at 7, 10, 12.

## Discussion

### I.   The ALJ's Decision

An individual is eligible to receive SSI if he is aged, blind, or disabled and meets certain income requirements. See 42 U.S.C.A. § 1382(a) (2003). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C.A. § 423(d)(1)(A) (2003); see also 42 U.S.C.A. § 1382c(a)(3)(A) (2003). A claimant's impairment must be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy. See 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(B). A severe impairment is defined as one which significantly limits an individual's ability to do basic work activities. See 20 C.F.R. § 416.920(c) (2003); see also Bowen v. Yuckert, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). The Commissioner is directed to "consider the combined effect of all of the individual's impairments

13

without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C.A. § 423(d)(2)(B). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986).

Following the familiar sequential evaluation,[5] the ALJ in

---

[5] The Social Security regulations prescribe a five-step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 416.920(a) (2004); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). Pursuant to that scheme, the Secretary must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the Secretary's listed impairments; (4) whether the claimant is able to perform his past relevant work; and (5) whether the claimant remains capable of performing any work within the economy. See 20 C.F.R. § 416.920(b)-(f). The evaluation may be terminated at any step. See Seavey, 276 F.3d at 4. "The applicant has the burden of production and proof at the first four steps of the process. If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001); see also Seavey, 276 F.3d at 5.

In 1996, Congress amended the Act "to preclude a finding of disability 'if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.'" Brown v. Apfel, 71 F.Supp.2d 28, 35 (D.R.I. 1999)(quoting Contract for America Advancement Act, Pub. L. No. 104-121 § 105(a)(1), 105(b)(1), 110 Stat. 847, 852-853 (codified as amended at 42 U.S.C. § 423(d)(2)(C) (1996))), aff'd, 230 F.3d 1347 (1st Cir. 2000).

Thus, under the Act as amended, if a finding of disability is made after the five step analysis, the Commissioner must go one step further and make this materiality determination. The "key factor" to be considered, in fact the only factor mentioned in the regulations, is whether the claimant would still be disabled absent the drug addiction or alcoholism.

Brown, 71 F.Supp.2d at 35; see also 20 C.F.R. § 404.1535(b)(1)(2004). Here, the ALJ concluded at step 4 that Plaintiff was not disabled. (R. at 27)

the instant case found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  (R. at 22, 27)  He determined that Plaintiff's impairments, namely a seizure disorder, hepatitis C, leg neuropathy, and an anxiety disorder, were severe but did not meet or equal a listed impairment.  (R. at 22-23, 27)  The ALJ found that Plaintiff retained the RFC to perform sedentary work or work that involves lifting no more than ten pounds at a time and that Plaintiff's past relevant work as a telemarketer did not require the above limitations (R. at 26-27).  Thus, he determined that Plaintiff's impairments did not prevent him from performing his past relevant work and concluded that Plaintiff was not disabled as defined in the Act.  (R. at 26-27)

## II.  Analysis

### A.   The ALJ's characterization of telemarketer as Plaintiff's past relevant work

The ALJ determined that Plaintiff had "past relevant work experience as a plasterer, church sexton, telemarketer[,] and an inserter." (R. at 22)  Plaintiff argues that the "ALJ improperly characterized [Plaintiff's] work as a telemarketer as 'past relevant work" even though there is no evidence that the job ever rose to the level of substantial gainful activity."  Plaintiff's Brief at 7.

Title 20 of the Code of Federal Regulations ("C.F.R.") § 416.960 defines past relevant work as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. § 416.960(b)(1) (2005); see also 20 C.F.R. § 416.965(a) (2005).  Section 416.972 (2005) states that "[s]ubstantial gainful activity is work activity that is both substantial and gainful ...."  20 C.F.R. § 416.972.  That section further defines substantial work activity as "work activity that involves doing

significant physical or mental activities," 20 C.F.R. §
416.972(a), and gainful work activity as "work activity that you
do for pay or profit," 20 C.F.R. § 416.972(b).

Plaintiff, on two separate occasions, informed his health
care providers that he had previously worked as telemarketer.
(R. at 354-55, 423).  On October 16, 2000, he told Dr. Evans that
his last employment was two years earlier as a telemarketer.  (R.
at 354).  On January 17, 2001, during the course of a new patient
interview at Memorial Hospital's Family Care Center, Plaintiff
gave his occupation as "telemarketer" (R. at 423) and indicated
that he had worked in such capacity for four years (id.),
although he was "[n]ow out of work" (id.).

Regarding the latter entry, Plaintiff suggests that "it is
unclear whether the writer intended to state that [Plaintiff] was
a telemarketer for four years or that he stopped working as a
telemarketer four years ago."  Plaintiff's Mem. at 8.  There is
no lack of clarity in the entry itself.  It plainly indicates
that Plaintiff worked as telemarketer for four years.  (R. at
423)  While Plaintiff's supposition regarding the writer's intent
may be correct, the reason for making such a supposition arises
not from the entry itself (or any document directly contradicting
it), but from the fact that Plaintiff's earnings record from 1987
through 2000 does not appear to reflect earnings from work as a
telemarketer (R. at 279-83).

Conflicts in the evidence are for the Commissioner to
resolve.  See Rodriguez v. Sec'y of Health & Human Servs., 647
F.2d 218, 222 (1st Cir. 1981); Gonzalez-Garcia v. Sec'y of Health
& Human Servs., 835 F.2d 1, 3 (1st Cir. 1987).  Defendant
notes that "the agency's earnings records are only accurate
and complete to the extent that income is properly reported
by employers or by self-employed earners," Defendant's
Memorandum of Law in Support of Motion for an Order Affirming the

Decision of the Commissioner ("Defendant's Mem.") at 14, and
suggests that Plaintiff may have worked as a telemarketer either
as an independent contractor or for an employer which did not
fulfill its reporting obligations, see id. at 15.  As evidence
tending to support this theory, Defendant points to the fact that
Plaintiff reported to a University Medical Group physician on
April 29, 1998, that he was working at the Salvation Army (R. at
321), but his earnings history does not reflect any earnings from
the Salvation Army during 1998 or at any other time, see
Defendant's Mem. at 14-15.  Plaintiff objects to Defendant's
suggestion, asserting that it is improper for Defendant "to make
arguments dependent on an assumption that [Plaintiff] and his
employer were engaged in illegal behaviors."  Plaintiff's Reply
Brief ("Plaintiff's Reply Mem.") at 3.  Plaintiff also notes that
there is no evidence he "was paid 'under the table' for his work
as a telemarketer."  Id.

　　　　The court finds it unnecessary to resolve this dispute.
Even if the court were to find that the statements attributed to
Plaintiff about his work as a telemarketer did not constitute
substantial evidence that such employment constituted past
relevant work (a proposition which the court considers doubtful),
his claim that the ALJ erred in characterizing it as such must
still be rejected for two reasons.

　　　　First, at Step 4 the burden is on the plaintiff to
demonstrate inability to perform his former work, see Manso-
Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st
Cir. 1996); Dudley v. Sec'y of Health & Human Servs., 816 F.2d
792, 794 (1st Cir. 1987), and where, as here, the  plaintiff
contends that his former work was of too short duration to be
relevant, it is also his burden to demonstrate this, see Dudley
at 794.  Plaintiff failed to meet that burden.  Plaintiff
introduced no evidence as to the length of time that he worked as

17

a telemarketer or the amount of earnings which he received from
that work.  Cf. Santiago v. Sec'y of Health & Human Servs., 944
F.2d 1, 5 (1st Cir. 1991)("In short, not only must the claimant
lay the foundation as to what activities her former work
entailed, but she must also point out (unless obvious)--so as to
put in issue--how her functional incapacity renders her unable to
perform her former usual work."); Pitchard v. Schweiker, 692 F.2d
198, 201 (1st Cir. 1982)(rejecting claim that ALJ erred in
finding that plaintiff could return to his former employment
where plaintiff, who was represented by counsel, "submitted no
evidence at the hearing and only a mere scintella in his second
application as to what the physical and mental demands of his
prior work in advertising were.").  The testimony of the VE that
telemarketer was included in Plaintiff's past relevant work (R.
at 52) was unrebutted.  Thus, I find that Plaintiff failed to
meet his burden on this issue.

     Second, Plaintiff waived the issue of whether his work as a
telemarketer rose to the level of substantial gainful activity by
failing to raise it before the ALJ.  See Mills v. Apfel, 244 F.3d
1, 8 (1st Cir. 2001)(finding plaintiff waived claim that ALJ
erred in concluding that plaintiff could return to prior jobs
even though jobs were extremely brief where plaintiff did not
raise the issue before ALJ).  Plaintiff, represented by counsel,
was on notice that his work as a telemarketer was being treated
as past relevant work.  The ALJ, in posing his hypothetical
question to the VE, concluded by asking whether an individual
with the stated capabilities and limitations could "do any of the
Claimant's past relevant work?"  (R. at 52)  The VE responded
that "[T]elemarketer would be within that ... hypothetical."
(Id.)  The ALJ then asked the VE if adding the inability to do
fine manipulation to the hypothetical would "affect the ability
to do the telemarketer job?"  (Id.)  The VE responded negatively.

(R. at 52)   The ALJ concluded that portion of his examination of
the VE by asking whether Plaintiff's "ability to do his past
relevant work or other work" (id.) would be eliminated if the
non-exertional limitations stated in the hypothetical were
moderately severe (id.).   The VE responded affirmatively.   (Id.)

It is plain from these questions and answers that both the
VE and the ALJ believed that Plaintiff's work as a telemarketer
constituted past relevant work.   (R. at 52-54)   Indeed, they
focused on it primarily.   (Id.)   Although Plaintiff's counsel
cross-examined the VE regarding how the job of telemarketer was
performed and the capabilities required for such work (R. at 52-
54), counsel did not challenge or question the VE's testimony
that Plaintiff's work as a telemarketer constituted past relevant
work (R. at 52-54, 56-57).   Counsel also did not indicate to the
ALJ in any manner that this was a disputed issue or that there
was reason to doubt that the Plaintiff's employment as a
telemarketer rose to the level of substantial gainful employment.
(Id.)   Counsel offered no testimony from Plaintiff to rebut the
VE's testimony that Plaintiff's past relevant work included that
of telemarketer, and she did not call the ALJ's attention to the
apparent absence of any telemarketing job from Plaintiff's
earnings record.   See Latulippe v. Commr., SSA, No. 95-82-SD,
1996 WL 360363, at *8 (D.N.H. Mar. 7, 1996)("Plaintiff provides
no reason or excuse for his failure to bring the matter to the
attention of the court sooner.").

In Mills v. Apfel, the United States Court of Appeals for
the First Circuit noted that a no-waiver approach at the ALJ
level to issues like the instant one "could cause havoc, severely
undermining the administrative process."   Id. at 8.   The court
explained:

> If the ALJ had heard the objection now made and agreed
> with it, he could easily have considered and expressly
> found that there were other jobs in the economy available

19

> to [the plaintiff].   Here, the ALJ stopped at step four
> of the five-step process when he found that [the
> plaintiff] could return to her old jobs;   but if the
> prior jobs had been removed from the picture he would
> have proceeded to step five to consider whether there
> were other jobs in the economy available to her.

Id.  The above rationale applies here with equal force.  Had the
issue now being raised by Plaintiff been brought to the ALJ's
attention at the time, he could have addressed it either by
asking about Plaintiff's other past relevant work or by
proceeding to step five.  Plaintiff's failure to do so warrants a
finding of waiver.

     Furthermore, the court agrees with Defendant that had the
ALJ proceeded to step 5, the VE's testimony would have adequately
supported a determination of "not disabled."  Defendant's Mem. at
15.  The last in a series of hypotheticals posed by the ALJ
described an individual who, in addition to the limitations
contained in the ALJ's RFC determination, was further limited by
the inability to hold a pen or to perform fine manipulation.  (R.
at 54).  Notwithstanding these additional limitations, the VE
testified that work existed in significant numbers in the
regional economy which such an individual could perform.  (Id.)

     Thus, even if the ALJ erred at Step 4 in finding that
Plaintiff could perform past relevant work as a telemarketer,
remand would not be warranted as the outcome of further
administrative proceedings is a virtual certainty.  The First
Circuit has held that administrative remand is not warranted in
such circumstances.

> [W]hen a reviewing court discovers a serious infirmity in
> agency decisionmaking, the ordinary course is to remand.
> But such a course is not essential if remand will amount
> to no more than an empty exercise.

Dantran, Inc. v. U.S. Dep't of Labor, 171 F.3d 58, 73 (1st Cir.
1999)(internal citations omitted).  Given the testimony by the VE

that there are thousands of jobs in the regional economy which a person with Plaintiff's RFC could perform (R. at 54), remand here would be pointless.[6]  See Mills v. Apfel, 244 F.3d at 8 ("[T]he result would be no different in *this* case even if we ... assumed that [the plaintiff]'s past employment should be disregarded .... [The plaintiff] would not have benefitted had the ALJ ignored her past work experience in favor of considering her ability to obtain alternative employment."); cf. Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989)(noting that, although an ALJ's opinion may be vulnerable, "[n]o principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); Rasmussen-Scholter v. Barnhart, No. Civ.A. 03-11889-DPW, 2004 WL 1932776, at *11 (D. Mass. Aug. 16, 2004)("While we would prefer more explanatory detail, we see no reason to return this case for the purely formulaic purpose of having the ALJ write out what seems plain on a review of the record.").

In sum, even if the ALJ committed error at step 4 (and the court has found that he did not), the ultimate result if the matter were remanded would not be any different.  Accordingly, Plaintiff's first claim of error is rejected.

---

[6] Plaintiff, in urging that the court not consider evidence that would support a determination of not disabled at step 5, cites two unpublished First Circuit opinions, Maldonado v. Secretary of Health & Human Services, No. 92-2186, 1993 U.S. App. LEXIS 16813 (1st Cir. July 7, 1993), and Perez-Velazquez v. Secretary of Health & Human Services, No. 92-2111, 1993 U.S. App. LEXIS 13135 (1st Cir. June 3, 1993).  As unpublished opinions, these cases do not undermine the continuing validity of the guidance provided in Dantran, Inc. v. U.S. Department of Labor, 171 F.3d 58, 73 (1st Cir. 1999), which is quoted above.  See 1st Cir. R. 36(c) ("[A] panel's decision to issue an unpublished decision means that the panel sees no precedential value in that opinion.").

## B.  The AlJ's consideration of Dr. Bleyer's opinion in determining Plaintiff's RFC

Plaintiff argues that the ALJ erred in "fail[ing] to mention, credit[,] or discredit the opinion of a medical source as to [Plaintiff's] limitations arising from his condition." Plaintiff's Brief at 10.  Specifically, Plaintiff contends that the ALJ impermissibly ignored the physician examination report completed by Dr. Bleyer[7] on January 6, 1999, and substituted his own opinion for that of the medical experts.  See id. at 10.

Defendant responds that "the ALJ was not obligated to consider Dr. Bleyer's opinion, as it pertained only to the time period at issue in Plaintiff's unsuccessful, prior SSI claim, which was denied at the initial application stage on June 25, 1999."  Defendant's Mem. at 16 (citing (R. at 236-39)).  If by this statement Defendant means literally that the ALJ did not have to even consider Dr. Bleyer's opinion, the court rejects such contention.  An ALJ must consider all evidence in the record.  However, the fact that the ALJ in Plaintiff's case did not refer to the report does not mean that he did not consider it.  "[A]n ALJ is not required to provide a 'complete written evaluation of every piece of testimony and evidence ....'"  Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004)(quoting Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995)).

Here the record reflects that the ALJ understood his responsibility to examine all the evidence.  (R. at 23)("I must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence ....  I must also consider any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the

[7] Dr. Bleyer's report is located at pages 350-53 of the Record.

22

nature and severity of the impairments and resulting
limitations.")(internal citations omitted).

Thus, the real issue raised by Plaintiff's second claim of
error is whether remand is required where an ALJ does not discuss
or mention a medical source's opinion of Plaintiff's limitations
for a prior period of alleged disability.  Here Dr. Bleyer's
opinion (R. at 350-53) predates by more than eighteen months
Plaintiff's protective filing date of date of August 25, 2000 (R.
at 299) and predates by more than a year the date Plaintiff
stopped working, January 15, 2000 (R. at 304).  In the absence of
any First Circuit authority on this issue, this court declines to
impose on ALJs the additional requirement that they discuss in
their written decisions not only medical source opinions
applicable to the current application which is before them, but
also those from prior applications.  It is not uncommon for a
record to contain medical source opinions rendered in connection
with one or more prior applications for benefits.  A requirement
that an ALJ discuss all of these earlier opinions in the course
of a decision regarding the current application would be unduly
burdensome.  Therefore, the court rejects Plaintiff's claim of
error on this issue and denies his request to remand the case.[8]

---

[8] Although Plaintiff's request for remand on this issue
presumably reflects a belief that requiring the ALJ to discuss Dr.
Bleyer's opinion in writing would result in a favorable determination,
the court doubts that this be the outcome.  Dr. Bleyer cited no
objective medical signs or laboratory findings to support the
limitations which he expressed.  (R. at 350-53)  While Plaintiff
states that Dr. Bleyer subsequently became his treating physician, the
record does not contain any additional records from Dr. Bleyer, and
this post examination development does not enhance the weight to be
given to Dr. Bleyer's opinion.   At the time he rendered his opinion,
Dr. Bleyer indicated that he had never previously treated or examined
Plaintiff.  (R. at 350)

**C.  The ALJ's consideration of the DDS consultant
psychologists as to Plaintiff's mental impairments**

Plaintiff asserts that the ALJ "erred in rejecting the
opinion of the state agency psychological consultants as to
[Plaintiff's] psychological limitations and in substituting [his]
opinion for that of the medical experts."  Plaintiff's Mem. at
12.  The consultants to whom Plaintiff refers are two
psychologists, Ann M. Frank, Psy.D.,[9] and Ann Paxson, Ph.D.[10]  See
id. at 13-15; see also (R. at 373, 411).  Plaintiff claims that
the ALJ had no medical basis for rejecting their opinions,
"especially given [Plaintiff's] extensive psychological history."
Plaintiff's Mem. at 12.

Strictly speaking, the ALJ did not reject[]" the opinion of
either consultant.  (R. at 25)  Rather, in the case of Dr. Frank
the ALJ found her assessment to be "generally credible" (R. at
25), but "not fully consistent with Dr. Lege's treatment notes
which show good control of the claimant's symptoms with
medication" (id. (citing R. at 439-52 and SSR 96-6p)).  As for
Dr. Paxson's assessment, while the ALJ did not specifically
mention her evaluation in his decision, the assessment (R. at
371-74) does not necessarily conflict with the ALJ's finding
regarding Plaintiff's residual functional capacity (R. at 26).
Dr. Paxson found that, if Plaintiff's substance abuse disorders
were excluded from consideration, Plaintiff would be able to
perform "at least simple, repetitive tasks."  (R. at 373)
Although Plaintiff acknowledges that Dr. Paxson did not state
that these were the only tasks which Plaintiff was capable of
performing, see Plaintiff's Mem. at 15 (noting "Dr. Paxson's
opinion that [Plaintiff] *might* be limited to simple, repetitive

---

[9] Dr. Frank's report can be found at pages 395-412 of the Record.

[10] Dr. Paxson's report is located at pages 357-75 of the Record.

tasks")(italics added), Plaintiff still faults the ALJ for
failing to articulate reasons for not adopting Dr. Paxson's
opinion regarding this possible limitation, see id.  The court
declines to hold that an ALJ must discuss in his decision not
only a claimant's actual limitations as found by medical experts
but also statements by those experts which may or may not be
limitations.  Thus, to the extent that this claim of error is
based on the ALJ's failure to discuss Dr. Paxson's assessment,
Plaintiff's argument is rejected.[11]  See Rice v. Barnhart, 384
F.3d 363, 370 (7th Cir. 2004)("[A]n ALJ is not required to
provide a 'complete written evaluation of every piece of
testimony and evidence ....'")(quoting Diaz v. Chater, 55 F.3d
300, 308 (7th Cir. 1995)).

    Returning to Dr. Frank's opinion, the ALJ actually adopted
several of Dr. Frank's findings, namely that Plaintiff had a
moderate reduction in the ability to concentrate (R. at 25, 409-
10) and to relate appropriately to supervision (R. at 25, 410),
resulting in a mild restriction of activities of daily living (R.
at 25, 405), moderate difficulty in maintaining social
functioning (R. at 25-26, 405), and moderate difficulty in
maintaining concentration, persistence, and pace (R. at 26, 405).
The ALJ did not adopt Dr. Frank's findings that Plaintiff had
moderate limitations in his ability to understand, remember, and
carry out detailed instructions, complete a normal workday
without interruption from psychologically based symptoms, and to

---

[11] Plaintiff also argues that the VE erred in testifying that the
telemarketer occupation is an unskilled occupation, see Plaintiff's
Mem. at 15 (citing the Dictionary of Occupational Titles ("DOT")); see
also id., Exhibit D (DOT § 299.357-014 Telephone Solicitor), and that
if the ALJ had adopted Dr. Paxson's opinion, the ALJ would have been
compelled to find that he could not perform his past work as a
telemarketer, see Plaintiff's Mem. at 15.  As explained above, the
court disagrees that the ALJ would have been "compelled" to make such
a finding because of the qualified nature of Dr. Paxson's statement
regarding Plaintiff's capabilities.

interact appropriately with the general public. (R. at 25-26).
He found that these limitations were not fully consistent with
the other evidence in the record, including Dr. Lege's treatment
notes which indicated that Plaintiff's anxiety and panic disorder
were being controlled by Valium and Paxil.  (R. at 25).  The ALJ
also noted that Plaintiff's statements about having panic attacks
and forgetfulness were not fully supported by the record.  (R. at
25).  Additionally, the ALJ observed that there were no
documented complaints of significant problems in dealing with
people or remembering things.  (Id.)  It is clear from the
context that these latter statements were additional reasons for
the ALJ's decision not to adopt all of the limitations found by
Dr. Frank.

Dr. Lege's treatment notes indicate that on July 6, 2001,
Plaintiff complained of an anxiety and panic disorder and that
Dr. Lege prescribed Valium and Paxil.  (R. at 443)  The next
month, on August 28, 2001, Dr. Lege reported that Plaintiff was
"doing well.  Tolerating all med[ication]s."  (R. at 444)  On
October 12, 2001, Dr. Lege noted that Plaintiff had "[n]o
complaints" (R. at 445), was tolerating his medications well
(id.), and his anxiety was "stable" (id.).  Plaintiff complained
on November 26, 2001, of achiness and sweating for several days
and reported that he was "out of Valium" (R. at 446),[12] but Dr.
Lege wrote that Plaintiff had no other new problems (id.).  Two
months later on January 7, 2002, Dr. Lege reported that Plaintiff
was out of his medication and had no complaints other than his
alcoholism.  (R. at 447)  Dr. Lege indicated on February 4, 2002,
that Plaintiff was tolerating his medications and that his
anxiety and panic disorders were being controlled by Valium and

---

[12] Although Plaintiff reported on November 26, 2001, that he was
out of Valium, Dr. Lege declined to prescribe more, noting that
Plaintiff should have had a supply left from his last prescription.
(R. at 446)

Paxil.  (R. at 448)

Dr. Frank's assessment is dated June 15, 2001 (R. at 395), and predates by as much as eight months Dr. Lege's treatment notes (R. at 443-448).  Thus, the treatment notes reflect a more current picture of Plaintiff's impairments.[13]   The ALJ was entitled to resolve the evidentiary conflict between the limitations suggested by Dr. Frank and the apparent improvement in Plaintiff's mental impairments which followed his subsequent treatment by Dr. Lege.  See Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts.").

While the ALJ must consider the DDS consultants' opinions, these physicians' opinions are not binding on the ALJ.  See 20 C.F.R. § 416.927(f)(2)(i) (2005) ("Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists .... [A]dministrative law judges must consider findings of State agency medical and psychological consultants ... as opinion evidence, except for the ultimate determination about whether you are disabled.").  Their opinions are considered using the same factors applicable to non-examining physicians. See 20 C.F.R. § 416.927(f); id. § 416.927(f)(2)(ii).[14]   Here the

---

    [13] Plaintiff in his brief states: "Despite the most recent updated opinion from a state agency psychologist who reviewed the entire record, the ALJ rejected this opinion in favor of his own layperson opinion as to the extent of [Plaintiff]'s limitations."  Plaintiff's Mem. at 12.  Plaintiff does not cite to the record for this statement and does not identify the psychologist to whom he is referring.  See id.  Presumably, the reference is either to Dr. Paxson or to Dr. Frank.  The court has already found that, strictly speaking, the ALJ did not "reject" either opinion.  See 24.

    [14] Except for instances where a treating source's opinion is given controlling weight under 20 C.F.R. § 416.927(d)(2), all of the

27

ALJ explained that Dr. Frank's assessment of Plaintiff was not fully consistent with other evidence in the record (R. at 25), specifically Dr. Lege's treatment notes (id.), Plaintiff's own statements (id.), and the absence of documented complaints of significant problems dealing with people or remembering things (id.).  I find that the ALJ's decision not to adopt all of Dr. Frank's finding is supported by substantial evidence.

Plaintiff further argues that the ALJ substituted his own opinion for that of the DDS consultant psychologists with regard to Plaintiff's psychological limitations.  See Plaintiff's Brief at 12.  The court has already determined that Dr. Paxson's assessment is not necessarily in conflict with the ALJ's finding regarding Plaintiff's residual functional capacity.  See Discussion section II.C. supra at 24.  Similarly, the court has already noted that the ALJ adopted several of Dr. Frank's findings.  See Discussion section II.C. supra at 25.  As for the three findings which the ALJ did not adopt, i.e., that Plaintiff had moderate limitations relative to following detailed instructions, completing a normal workday, and interacting with the public (R. at 25-26), there is evidence in the record from medical professionals supporting this omission.  Dr. Paxson wrote in her October 30, 2000, functional capacity assessment that "Dr. Evans note[d] that there are no behavioral difficulties driven by ... anxiety or depression. [Drug abuse and alcoholism] cause[] [symptoms] which are responsible for impairment."  (R. at 373).  Dr. Paxon also recorded that Plaintiff's interaction with others

---

following factors are considered in determining the weight to be given to any medical opinion: (1) the examining relationship; (2) the treatment relationship, including its length, nature, and extent as well as the frequency of examination; (3) the supportability of the opinion using medical signs and laboratory findings; (4) the consistency of the opinion with the rest of the record; and (6) other factors which tend to support or contradict the opinion.  See 20 C.F.R. § 416.927(d) (2005).

was impaired by alcohol abuse (R. at 373) which implies that this impairment would not otherwise exist.  Dr. Bleyer found that Plaintiff had no limitation on the ability to interact appropriately with co-workers and supervisors.  (R. at 352). While the form which Dr. Bleyer completed did not ask about "detailed" instructions, the doctor indicated that Plaintiff had no mental limitations in remembering and carrying out "simple" instructions.  (R. at 352).  Given all of the evidence in the record, the court does not find that the ALJ substituted his own opinion for that of the state agency psychologists.

In conclusion, the court finds that the ALJ's decision regarding Plaintiff's psychological limitations is supported by substantial evidence.  Although Plaintiff argues that the ALJ rejected the opinions of both Dr. Paxson and Dr. Frank, it is clear from the record that the ALJ did not completely reject either doctor's opinion, nor did he substitute his own opinion for that of a medical professional.  Thus, the court finds that remand is not warranted on this issue.

### Summary

Plaintiff's challenge to the ALJ's finding that Plaintiff's past relevant work included that of telemarketer is rejected for two reasons.  First, at Step 4 the burden is on Plaintiff to demonstrate that his work as a telemarketer was not long enough to constitute past relevant work, and Plaintiff here failed to rebut the testimony of the VE that telemarketer was included in Plaintiff's past relevant work.  Second, Plaintiff also waived this issue by not raising it at the hearing, when it could have been addressed by the ALJ, despite being on notice that telemarketer was being considered as past relevant work. Moreover, even if the ALJ erred on this issue, remand is not warranted because the outcome of further administrative proceedings is a virtual certainty.

29

Regarding Plaintiff's claim that the ALJ failed to discuss Dr. Bleyer's opinion, in the absence of clear First Circuit guidance the court declines to impose on ALJs the requirement that they discuss not only medical source opinions applicable to the current application before them, but also those pertaining to prior applications.  In addition, Dr. Bleyer is a one-time examining consultant, his report is not supported by objective medical evidence, and it is doubtful that discussion of this report by the ALJ would affect the outcome of Plaintiff's case.

Finally, the court rejects Plaintiff's claim that the ALJ impermissibly rejected the opinions of two of the state agency psychologists and substituted his own opinion for that of a medical professional.  The ALJ cited valid reasons for not fully adopting the findings of Dr. Frank, and the opinion of Dr. Paxson was not necessarily inconsistent with the ALJ's findings.  The ALJ did not improperly substitute his opinion for those of medical professionals.  To the extent that the ALJ did not adopt the findings of these psychologists, his decision is supported by substantial evidence.

### Conclusion

For the reasons stated above, the court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record and is legally correct.  Accordingly, Plaintiff's Motion for Summary Judgment is hereby denied and Defendant's Motion to Affirm is hereby granted.

So ordered.

ENTER:                                           BY ORDER:

_____                 _____
David L. Martin                                  Deputy Clerk
United States Magistrate Judge
June 1, 2005